1  Robert W. Cohen (State Bar No. 150310)
   Law Offices of Robert W. Cohen
2  A Professional Corporation
   1875 Century Park East, Suite 1770
3  Los Angeles, CA 90067
   Tel. (310) 282-7586
4
   R. Alexander Saveri (State Bar No. 173102)
5  Saveri & Saveri, Inc.
   706 Sansome Street
6  San Francisco, California 94111
   Tel. (415) 217-6810
7
   Attorneys for Plaintiff
8  IL FORNO, INC.

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                                          Case No.: CV11 0306   RSWL PJWx

13  IL FORNO, INC., on behalf of itself and
    all other similarly situated persons,
14
              Plaintiff,                    **COMPLAINT**
15
          v.
16
    AMERICAN EXPRESS COMPANY
17  and AMERICAN EXPRESS TRAVEL
    RELATED SERVICES COMPANY,
18  INC.,

19            Defendants.

20

21        Plaintiff Il Forno, Inc., on behalf of itself and all others similarly situated, hereby

22  alleges for its Complaint against Defendants American Express Company and American

23  Express Travel Related Services Company, Inc. (together, "American Express" or

24  "Amex") as follows:

25                            **I.**
26                     **INTRODUCTION**

27        1. This action challenges Amex's rules preventing U.S. merchants from providing

28  consumers with incentives to use forms of payment that are less expensive to the

1

**Complaint**

1   merchant than Amex-branded payment cards (the "Anti-Steering Rules.")  In the absence
2   of the Anti-Steering Rules, consumers would have incentives to use payment forms —
3   such as debit cards, cash, checks, Visa-, MasterCard- and Discover-branded payment
4   cards, and so forth — that impose lower costs upon the merchant than do Amex-branded
5   payment cards.  If merchants were free to give consumers incentives to use less costly
6   payment products, then Amex would be under pressure to reduce its merchant pricing or
7   lose consumers to cheaper payment forms. The Anti-Steering Rules, however, insulate
8   Amex from any such price-based competition. By ensuring that the consumer neither
9   knows nor cares how expensive her payment product is to the merchant, and thus has no
10  incentive to switch to an alternative payment form, or a competitor of Amex, the Anti-
11  Steering Rules serve to entrench Amex's position of monopoly power in the U.S.
12  markets for corporate, small business, and personal charge card services, among other
13  markets.

14        2. The Anti-Steering Rules further ensure that certain merchants seeking to pass
15  along the high merchant discount fees they incur on Amex payment card services must
16  raise their prices to all consumers, including cash-payers, debit card users, and those who
17  would otherwise seek to avoid the high cost of such services. In the absence of the Anti-
18  Steering Rules, the merchant would be free — for example — to impose the merchant
19  discount fee directly upon the Cardholder who chooses to use the more expensive Amex-
20  branded payment card.  The price of goods and services would fall because those prices
21  would no longer be marked up to reflect artificially inflated merchant discount fees.

22        3. In addition to insulating Amex from competition and raising prices for all
23  consumers, the Anti-Steering Rules compel inequitable and anticompetitive subsidies,
24  running from the least affluent U.S. consumers to the most affluent. Because merchants
25  must mark up the price of all goods to cover the costs of accepting Amex-branded
26  payment products — rather than impose the discount fee directly upon Amex
27  Cardmembers or otherwise steer the Cardmember to a cheaper payment form — the
28  Anti-Steering Rules effectively compel cash payers and users of other low cost payment

**Complaint**

1    forms to subsidize all of the costly perquisites enjoyed by Cardmembers using Amex-

2    branded payment card products, including frequent flier miles, rental car insurance, free

3    gifts and even cash-back rewards.

4         4.   Finally, the Anti-Steering Rules flatly preclude merchants from seeking to

5    compete with one another on the dimension of whether and how they "price" their

6    acceptance services to consumers.  Just as merchants may compete on whether to

7    discount Pepsi relative to Coke, they should also be free to compete on whether to

8    discount Discover card acceptance relative to Amex.  On their face, then, the challenged

9    rules thus harm competition among merchants, quite apart from the harm they inflict

10   upon competition in the payment services industry.

## II.
## JURISDICTION AND VENUE

13        5.   This Court has jurisdiction over this action under 28 U.S.C. § 1331, in that,

14   pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to prevent

15   and restrainviolations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

16        6.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§

17   22 and 26, because the Defendants may be found or transact business within this

18   District.

## III.
## THE PARTIES

21        7.   Plaintiff Il Forno, Inc. is a corporation organized under the laws of California,

22   with its principal place of business in Santa Monica, California, where it operates Il

23   Forno Trattoria and accepts American Express payment cards, pursuant to a card

24   acceptance agreement that it entered into prior to 1999.  That card acceptance agreement

25   does not contain any provision purporting to waive Il Forno's right to bring a class

26   action.  Nor does that agreement contain a dispute resolution or forum selection clause.

27   The agreement, on information and belief, does allow Amex to unilaterally make

28

Complaint

1    "changes" to existing terms of the agreement, but it does not authorize the unilateral
2    addition of terms, such as an arbitration clause or class action waiver.

3         8.  Defendant American Express Company is a New York corporation with its
4    principal place of business in New York, New York.

5         9.  Defendant American Express Travel Related Services Company, Inc. is a
6    Delaware corporation, with its principal place of business in New York, New York, and
7    is a wholly owned subsidiary of American Express Company.  American Express Travel
8    Related Services Company, Inc. is generally responsible for all aspects of the payment
9    card business conducted under the American Express brand, including the operation of
10   the American Express network.  Depending on context, as used herein, the terms
11   "American Express" or "Amex" may refer to Defendants or the American Express
12   network or the American Express brand.

13                                             **IV.**

14                        **CLASS ACTION ALLEGATIONS**

15       10.  Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(b)(2) and
16   (b)(3) to restrain an unlawful practice under Sections 1 and 2 of the Sherman Act and the
17   Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*

18       11.  The class is comprised of all California merchants that have accepted Amex-
19   branded payment cards during the longest period of time permitted by the applicable
20   statute of limitations (the "Statutory Period") within the State of California (the
21   "Class"). The Class does not include Amex or its agents, subsidiaries or affiliates.

22       12.  The members of the Class are so numerous that joinder of all members is
23   impracticable.

24       13.  Questions of law or fact common to the members of the class predominate
25   over any questions affecting only individual members.

26       14.  The claims of the Plaintiff are typical of the claims of the Class.

27

28

**Complaint**

1    15.  Plaintiff and its counsel will fairly and adequately represent the interests of

2    the Class. Plaintiff has retained counsel who is competent and experienced in federal

3    antitrust and class action litigation.

4    16.  Amex has acted and continues to act on grounds that are generally applicable

5    to the Class, such that final injunctive relief with respect to the Class as a whole is

6    appropriate, within the meaning of Federal Rule of Civil Procedure 23(b)(2).

7    17.  This class action is superior to any other method for the fair and efficient

8    adjudication of this dispute.  There will be no extraordinary difficulty in the management

9    of this class action.

10                                   **V.**

11                      **FACTUAL BACKGROUND**

12   **Industry Background**

13   18.  When a consumer presents an Amex-branded payment card to a retailer for

14   payment, the merchant swipes the card and transmits a record of the transaction to

15   Amex. Amex then sends to the retailer's bank account an amount of money that is,

16   generally speaking, equal to the transaction amount minus the "merchant discount fee"

17   that Amex charges retailers. For a typical retailer in many industries, that discount fee is

18   roughly 3% of the total transaction. At 3%, if a Cardmember presents an Amex-branded

19   payment card to make a $100 purchase, the merchant will receive $97 from Amex, and

20   Amex will bill its Cardmember for $100.

21   19.  Other payment products are far less costly to the merchant. Debit cards,

22   Discover-branded credit cards, and even most Visa- and MasterCard-branded payment

23   cards carry much lower discount fees than Amex.  And of course, cash and checks are

24   likewise far less costly to the merchant. As a result, if merchants were able to steer

25   transactions to payment forms other than Amex, they would realize significant savings.

26   In a competitive retail marketplace, those savings will be passed along to all consumers

27   in the form of lower prices for all.

28

**Complaint**

**The Anti-Steering Rules**

20.   There are many ways that a retailer might steer transactions to a less costly and more efficient payment card, including:

- offering a discount for using a cheaper form of payment, such as Discover-, Visa-, and MasterCard-branded credit cards, debit cards, checks or cash;

- verbally asking customers if they mind using the cheaper payment form;

- posting signage indicating a preference for the cheaper payment form;

- posting the decals and signs of less expensive payment networks and yet not posting the decal or sign of Amex;

- imposing a small surcharge for using Amex-branded payment cards (provided the retailer is located in one of the 41 states and the District of Columbia where such surcharges are legal); and

- taking any other actions that merchants may yet devise if they were not constrained by the anticompetitive rules against steering.

21.  Amex's Anti-Steering Rules, however, strictly prohibit merchants from engaging in any of these efficiency-enhancing practices.

22.   The Anti-Steering Rules are set forth in Amex's standard form Card Acceptance Agreement and are available on the "Merchants" section of Amex's website. A typical iteration of the Terms And Conditions For American Express® Card Acceptance Agreement, drawn from Amex's website on January 30, 2007, provides:

> When a customer asks what payment methods are accepted, you will mention the Card. You will honour the Card, and will not attempt to: (1) dissuade the Cardmember from using the Card; (2) criticize or mischaracterize the Card or any services or programs offered in connection with the Card; (3) persuade the Cardmember to use any other credit, charge, debit or smart card or other card, account access device or service; or (4) impose any restrictions or conditions on the use or acceptance of the Card that are not imposed equally on the use or acceptance of other cards.

23.  The Card Acceptance Agreement further provides the merchant may not engage in any practices or programs that "indicate or imply that you prefer Other

**Complaint**

1   Payment Products;" nor may the merchant "promote the use of any Other Payment

2   Products more actively than you promote the use of the [Amex] Card."

3        24.  The intended and actual result of Amex's Anti-Steering Rules is near-total

4   insulation from price-based competition in the payment card services markets.  A

5   competitor network - such as Discover Financial Services or a new market entrant - may

6   offer to provide comparable services to retailers at a fraction of the price charged by

7   Amex.  Such a pro-competitive strategy, however, will not allow this would-be

8   competitor to gain any market share from Amex.  The reason that the competitor network

9   cannot gain market share by offering the same services at lower prices is because of the

10  Anti-Steering Rules.  The Anti-Steering Rules create a vertical restraint that ensures that

11  the consumer will have no incentive to use the less expensive and more efficient

12  payment medium.  And it is the consumer who decides which payment option to use.

13  The Anti-Steering Rules thus render Amex largely impervious to price-based

14  competition.

15       25.  In the absence of Amex's Anti-Steering Rules, moreover, the fees that Amex

16  is able to charge merchants for processing transactions on the Amex payment card

17  network would be greatly diminished.  Merchants would incur lower fees and pass along

18  the benefits to consumers in the form of lower prices.

19       26.  Further, the abolition of the Anti-Steering Rules would enable merchants and

20  their customers to avoid the cost of all the frequent flier miles, Membership Rewards

21  Points®, travel insurance and other perquisites that are financed out of merchant

22  discount fees.  Presently, the benefits enjoyed by Amex Cardmembers are subsidized by

23  all consumers, as well as merchants.  If merchant were free to offer inducements to use

24  less expensive payment forms, then customers who nonetheless choose to use an

25  expensive payment medium, such as Amex, would pay for the privilege.  While an

26  affluent shopper who is 200 points shy of a free trip to Hawaii may not balk at an extra

27  two dollars on her check-out ticket, the cash-payer and on-line debit user will be relieved

28  of the obligation to subsidize that particular junket.

**Complaint**

**Market Definition and Market Power**

27.   Under any appropriate definition of a relevant product market in this case, American Express has substantial market power or monopoly power.

     *i.  American Express Card Acceptance Services Market*

28.   There exists a relevant product market consisting of the services provided to merchants for accepting American Express payment cards.  As a result of the challenged Anti-Steering Rules, American Express's ability to impose supra-competitive prices upon merchants is not meaningfully constrained by price competition from other payment networks.  If Amex increases merchant prices significantly over a competitive baseline - or if a competitor network, such as Discover or MasterCard, drops its merchant fees by a significant amount -- a merchant such as plaintiff has no ability to steer transaction volume away from the expensive Amex network over to the now-cheaper competitor network.  In a properly functioning market, Amex could not raise its prices above a competitive baseline without having transaction volume migrate to less expensive networks.  In economic terms, then, there is extraordinarily low cross-elasticity of demand as between American Express acceptance services and those offered by other networks.  As a result, the product dimension of the relevant market is properly limited to acceptance services for the American Express network.

29.   American Express has monopoly power in the market for American Express card acceptance services.

     *ii.  Corporate and Small Business Card Services Markets*

30.   There further exist relevant markets, the product dimensions of which are no broader than all corporate and small business card acceptance services.

31.   The majority of Amex's corporate card holding customers - generally, large corporations - mandate that their executives must use the American Express corporate card if they wish to be reimbursed for their business expenses.  Amex itself fosters such policies by its clients, which it refers to as "mandated usage" policies.  Mandated usage, in turn, generates extraordinary "insistence" on the part of cardholders.  Amex then touts

**Complaint**

1  these mandated usage policies to merchants, in seeking to justify its high discount fees.
2  The result is that, from the standpoint of merchants, other payment products are not
3  ready substitutes for corporate card acceptance.  Cross-elasticity of demand as between
4  corporate card acceptance services and other acceptance services is extraordinarily low.

5      32.  Small business cards similarly generate highly inelastic demand due to
6  features such as management reporting and account expense tracking; discounts for
7  typical business expenses; special insurance programs; and robust rewards programs.  In
8  addition, small business charge and credit cards are a source of capital for small
9  businesses.  According to American Express, the two core needs of small businesses are
10 managing their cash flow and access to information that could help them better manage
11 and grow their business. Small business cards meet both these needs in ways that other
12 cards do not.

13     33.  American Express has substantial market power or monopoly power in the
14 markets for corporate and small business card acceptance services.  Courts sometimes
15 recognize that a high share of a relevant market constitutes evidence of market power in
16 that market.  On that measure, Amex's market power is clear.  During the Class Period,
17 Amex's share of a multi-brand credit card market has been in the vicinity of 70%, while
18 its share of small business was consistently above 45%.

19     *iii.*   *General Purpose Credit and Charge Card Services Market*

20     34.  Irrespective of the definition of the relevant market -- i.e., even if one defines
21 the relevant product market so broadly as to include all credit and charge card services
22 provided to merchants -- American Express has market power.

23     35.  Amex has demonstrated its monopoly power throughout the relevant period
24 by: maintaining supracompetitive discount rates; charging significantly different prices
25 to different groups of merchants for reasons unrelated to the cost of providing service;
26 establishing prices without regard to the cost of providing services; managing to raise or
27 maintain prices as sales volume increased substantially; and forcing merchants to accept
28 the Anti-Steering Rules.

9

**Complaint**

36.   There have existed at all relevant times substantial barriers to entering the payment card services business.  The challenged rules foreclose what would otherwise be the most likely and obvious route to entry - viz., the provision of acceptance services to merchants at costs that are below those of competitor networks.  For this and other reasons, there have been no successful new entrants in the U.S. credit card network business for over a quarter century - a staggering period of time in any industry.

### iv.   Geographic Dimension

37.   The geographic dimension of each of the above-referenced relevant product markets is the United States.

## Nature of the Injuries

38.   The Anti-Steering Rules injure merchants because, among other things, they insulate Amex from price-based network competition, thereby enabling Amex to extract supra-competitive discount fees.  The Anti-Steering Rules only insulate Amex from competitive pressures in merchant pricing because the Rules are imposed across the board, on all U.S. merchants.  For any particular merchant, then, this harm is not inflicted merely by Amex prohibiting that merchant from steering.  Instead, the particular merchant is harmed because Amex imposes the Anti-Steering Rules upon each new and existing merchant that joins or participates in the Amex network, and because Amex enforces its Anti-Steering Rules.

39.   As a direct and foreseeable result of Amex's enforcement of its Anti-Steering Rules, merchants have suffered damages.  But for the Anti-Steering Rules, Amex would be compelled to, and would in fact, charge merchants significantly lower discount fees than it presently does. The difference between Defendants' merchant fees and the fees that would apply but for the Anti-Steering Rules represents damages to the merchant Class.

40.   In addition, but for Amex's Anti-Steering Rules, merchants would be free to compete on the dimension of whether and how to discount or otherwise price acceptance services.

**Complaint**

### FIRST CLAIM FOR RELIEF

*For Violation of the Cartwright Act,*
*California Business and Professional Code § 16700 et seq.,*
*Based on the Imposition and Enforcement of the Anti-Steering Rules*

41.   Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

42.   Amex has engaged in and continues to engage in unlawful contracts in an unreasonable restraint of trade in violation of § 16700 et seq. of the Cartwright Act (Cal. Bus. & Prof. Code § 16700 et seq.).  These unlawful contracts were entered into and effectuated within the State of California.

43.   The Anti-Steering Rules, which Amex imposes on and enforces with respect to every member of the Class, represent an unlawful contract in restraint of trade. Among other things, the Anti-Steering Rules represent a vertical restraint that has the clear effect of restraining interbrand (i.e., horizontal) competition both in the markets for payment card services, and in the markets for competition between and among merchants.

44.   The Anti-Steering Rules have numerous additional anticompetitive effects, including the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of Defendants' high cost payment media, the entrenchment of Amex's market position and the insulation of Amex against any competitive threat from a rival offering cheaper or more efficient payment card services.

45. The Anti-Steering Rules are not necessary to accomplish a legitimate procompetitive benefit to Amex.

46.   As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, Plaintiff has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

**Complaint**

47.  As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, Plaintiff has suffered damages in an amount to be determined at trial.

48.  Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

### SECOND CLAIM FOR RELIEF

*For Willful Monopoly Maintenance In Violation of Section 2*
*of The Sherman Act, 15 U.S.C. §2, Based on The*
*Imposition And Enforcement of The Anti-Steering Rules*

49.  Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

50.  Section Two of the Sherman Act prohibits anticompetitive acts undertaken to maintain or achieve monopoly power.

51.  Amex has and exercises monopoly power in the market for American Express payment card acceptance services, as set forth above.  Alternatively, American Express has and exercises monopoly power in a multi-brand market for corporate card services, as set forth above.

52.  The Anti-Steering Rules further and protect Amex's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient payment card services to merchants.

53.  The Anti-Steering Rules harm the competitive process, harm consumers, and are not supported by any procompetitive justification.

54.  Amex's willful maintenance of monopoly power by the anticompetitive device of the Anti-Steering Rules constitutes a violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

55.  As a direct and foreseeable result of Amex's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Rules, Plaintiff has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

**Complaint**

56.  As a direct and foreseeable result of Amex's willful maintenance of monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Rules, Plaintiff has suffered damages in an amount to be determined at trial.

57.  Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

### THIRD CLAIM FOR RELIEF

*For Imposition of Unreasonable Restraints of Trade*
*in Violation of Section 1 of the Sherman Act, 15 U.S.C. §1, Based on*
*the Imposition and Enforcement of the Anti-Steering Rules*

58.  Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

59.  Section One of the Sherman Act prohibits contracts in restraint of trade.  More specifically, it prohibits a defendant from exercising market power to impose anticompetitive vertical restraints.

60.  Amex has and exercises market power in the relevant markets identified above.

61.  The Anti-Steering Rules, imposed upon every member of the Class by Amex, represent an unlawful contract in restraint of trade.   Among other things, the Anti-Steering Rules represent a vertical restraint that has the clear effect of restraining interbrand (i.e., horizontal) competition both in the markets for payment card services and in the markets for competition between and among merchants.

62.  The Anti-Steering Rules are anticompetitive.  Among the anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of Defendants' high cost payment media, the entrenchment of Amex's market position and the insulation of Amex against any competitive threat from a rival offering cheaper or more efficient payment card services.

63.  There exists no procompetitive justification for the Anti-Steering Rules.

**Complaint**

64. As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, Plaintiff has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

65. As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Rules, Plaintiff has suffered damages in an amount to be determined at trial.

66. Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

### FOURTH CLAIM FOR RELIEF

*For Imposition of Unreasonable Restraints of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. §1, Based on the Imposition and Enforcement of the Insulation Provisions*

67. Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

68. Section One of the Sherman Act prohibits contracts in restraint of trade.

69. Amex has and exercises market power in the relevant markets identified above.

70. In its card acceptance agreements with more than 99% of U.S. merchants, Amex purports to insulate itself from any challenge that might be brought, in any litigation or arbitral setting, by two or more merchants acting collectively (the "Insulation Provisions"). Upon information and belief, the Insulation Provisions were devised by American Express with the specific intention of immunizing American Express against liability under the antitrust laws, where market-wide anticompetitive behavior is invariably redressed by collective action on the part of direct purchasers, whether as class members or groups of individual plaintiffs.

71. Under the Insulation Provisions, a merchant typically forfeits the ability to: (i) have its claim consolidated or aggregated with any claim asserted by any other merchant against Amex; (ii) act as a representative plaintiff in any class action; or (iii) be

14

**Complaint**

1  represented as a passive class member (and presumably share in the benefit of any

2  award) in a class action.

3      72.  As a direct and foreseeable result of Defendants' willful imposition of the

4  Insulation Provisions, American Express stands to reap many tens of millions of dollars

5  in overcharges from California merchants each year, comfortable in the knowledge that it

6  is wholly immunized from damages suits (or, at most, is exposed only to damages claims

7  by a handful of very large merchants whose economic interests are sufficient to warrant

8  the extraordinary expense of large-scale one-on-one antitrust litigation).

9      73.  Plaintiff has suffered and continues to suffer irreparable injury for which there

10  is no adequate remedy at law.

11      74.  Defendants' imposition and enforcement of the Exculpatory Provisions is

12  likely to continue if not enjoined.

13      WHEREFORE, Plaintiff respectfully seeks an Order:

14      A.  Directing that the instant action for injunctive relief may be maintained as a

15  Class Action, on behalf of the Class defined above, under Fed. R. Civ. P. 23(b)(2);

16      B.  Directing that the instant action for damages may be maintained as a Class

17  Action, on behalf of the Class defined above, under Fed. R. Civ. P. 23(b)(3);

18      C.  Declaring that the Amex Anti-Steering Rules are illegal and directing their

19  rescission;

20      D.  Declaring that the Amex Insulation Provisions are unenforceable as applied in

21  this action;

22      E.  Directing Defendants to cooperate with Plaintiff in the establishment, funding

23  and execution of a campaign that adequately informs merchants and consumers of the

24  rescission of the Anti-Steering Rules;

25      F.  Awarding damages in an amount to be determined at trial and then trebled;

26      G.  Awarding attorneys' fees and costs of suit; and

27      H.  Granting such other and further relief as this Court may deem just and proper.

28

**Complaint**

1

## JURY DEMAND

2      Plaintiff hereby demands trial by jury of all issues so triable.

3   DATED: January 8, 2011                    LAW OFFICES OF ROBERT W. COHEN
                                              A Professional Corporation
4

5                                             By _____
6                                                 Robert W. Cohen
                                                  Attorney for Plaintiff
7                                                 IL FORNO, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Complaint**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Ronald S. W. Lew and the assigned discovery Magistrate Judge is Patrick J. Walsh.

The case number on all documents filed with the Court should read as follows:

## CV11- 306 RSWL (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Robert W. Cohen (SBN 150310)
Law Offices of Robert W. Cohen
1875 Century Park East, Suite 1770
Los Angeles, CA 90067
Tel. (310) 282-7586

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| IL FORNO, INC., on behalf of itself and all other similarly situated persons, | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | **CV11 0306 RSWL PJWx** |
| v. | |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): <u>AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATGED SERVICES COMPANY, INC.</u>

A lawsuit has been filed against you.

Within <u>  21  </u> days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, <u>Robert W. Cohen</u>, whose address is <u>1875 Century Park East, Suite 1770, Los Angeles, CA 90067</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

JAN 1 1 2011

Dated: _____

By: _____
**CHRISTOPHER POWERS**

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    **SUMMONS**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself □) | DEFENDANTS |
|---|---|
| Il Forno, Inc | AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICE COMPANY, INC. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Robert W. Cohen, Law Offices of Robert W. Cohen, APC, 1875 Century Park East, Suite 1770, Los Angeles, CA  90067, Tel. (310) 282-7586  see attachment | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

□ 1 U.S. Government Plaintiff ☑ 3 Federal Question (U.S. Government Not a Party)

□ 2 U.S. Government Defendant □ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | □ 1 | □ 1 | Incorporated or Principal Place of Business in this State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  □ 2 Removed from State Court  □ 3 Remanded from Appellate Court  □ 4 Reinstated or Reopened  □ 5 Transferred from another district (specify):  □ 6 Multi-District Litigation  □ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes  □ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  □ No          ☑ **MONEY DEMANDED IN COMPLAINT: $** undetermined

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Sherman Act Violations, 15 U.S.C. §§ 1 and 2.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| □ 400 State Reapportionment | □ 110 Insurance | □ 310 Airplane | □ 370 Other Fraud | □ 510 Motions to Vacate Sentence Habeas Corpus | □ 710 Fair Labor Standards Act |
| ☑ 410 Antitrust | □ 120 Marine | □ 315 Airplane Product Liability | □ 371 Truth in Lending | | □ 720 Labor/Mgmt. Relations |
| □ 430 Banks and Banking | □ 130 Miller Act | □ 320 Assault, Libel & Slander | □ 380 Other Personal Property Damage | □ 530 General | □ 730 Labor/Mgmt. Reporting & Disclosure Act |
| □ 450 Commerce/ICC Rates/etc. | □ 140 Negotiable Instrument | □ 330 Fed. Employers' Liability | □ 385 Property Damage Product Liability | □ 535 Death Penalty | □ 740 Railway Labor Act |
| □ 460 Deportation | □ 150 Recovery of Overpayment & Enforcement of Judgment | □ 340 Marine | **BANKRUPTCY** | □ 540 Mandamus/ Other | □ 790 Other Labor Litigation |
| □ 470 Racketeer Influenced and Corrupt Organizations | | □ 345 Marine Product Liability | □ 422 Appeal 28 USC 158 | □ 550 Civil Rights | □ 791 Empl. Ret. Inc. Security Act |
| □ 480 Consumer Credit | □ 151 Medicare Act | □ 350 Motor Vehicle | □ 423 Withdrawal 28 USC 157 | □ 555 Prison Condition | **PROPERTY RIGHTS** |
| □ 490 Cable/Sat TV | □ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | □ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | □ 820 Copyrights |
| □ 810 Selective Service | | □ 360 Other Personal Injury | □ 441 Voting | □ 610 Agriculture | □ 830 Patent |
| □ 850 Securities/Commodities/ Exchange | □ 153 Recovery of Overpayment of Veteran's Benefits | □ 362 Personal Injury-Med Malpractice | □ 442 Employment | □ 620 Other Food & Drug | □ 840 Trademark |
| □ 875 Customer Challenge 12 USC 3410 | □ 160 Stockholders' Suits | □ 365 Personal Injury-Product Liability | □ 443 Housing/Acco-mmodations | □ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| □ 890 Other Statutory Actions | □ 190 Other Contract | □ 368 Asbestos Personal Injury Product Liability | □ 444 Welfare | | □ 861 HIA (1395ff) |
| □ 891 Agricultural Act | □ 195 Contract Product Liability | **IMMIGRATION** | □ 445 American with Disabilities - Employment | □ 630 Liquor Laws | □ 862 Black Lung (923) |
| □ 892 Economic Stabilization Act | □ 196 Franchise | □ 462 Naturalization Application | □ 446 American with Disabilities - Other | □ 640 R.R. & Truck | □ 863 DIWC/DIWW (405(g)) |
| □ 893 Environmental Matters | **REAL PROPERTY** | □ 463 Habeas Corpus-Alien Detainee | □ 440 Other Civil Rights | □ 650 Airline Regs | □ 864 SSID Title XVI |
| □ 894 Energy Allocation Act | □ 210 Land Condemnation | □ 465 Other Immigration Actions | | □ 660 Occupational Safety /Health | □ 865 RSI (405(g)) |
| □ 895 Freedom of Info. Act | □ 220 Foreclosure | | | □ 690 Other | **FEDERAL TAX SUITS** |
| □ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | □ 230 Rent Lease & Ejectment | | | | □ 870 Taxes (U.S. Plaintiff or Defendant) |
| □ 950 Constitutionality of State Statutes | □ 240 Torts to Land | | | | □ 871 IRS-Third Party 26 USC 7609 |
| | □ 245 Tort Product Liability | | | | |
| | □ 290 All Other Real Property | | | | |

CV11  0306

FOR OFFICE USE ONLY:     Case Number _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No  ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                       ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                       ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                       ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Il Forno, Inc. -- Los Angeles | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | American Express Company -- New York<br>American Express Travel Related Services Company, Inc. -- New York |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
    **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date January 10, 2010

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program   (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability   (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended  (42 U.S.C. (g)) |